UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| William Steven Martin ) | |
| and Gayle Lynne Martin, ) | Case No. 08-11698 C-7G |
| ) | |
| Debtors. ) | |
| ) | |

MEMORANDUM OPINION

This case came before the court on May 5, 2009, for hearing on a motion to dismiss this case pursuant to section 707(b) of the Bankruptcy Code filed by the United States Bankruptcy Administrator ("BA"). Robert E. Price, Jr. appeared on behalf of the BA and Phillip E. Bolton appeared on behalf of the Debtors. Having considered the evidence and arguments of counsel, the court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil Procedure.

The basis for the BA's motion is that the granting of relief in this case would be an abuse of the provisions of Chapter 7. The first issue raised by the BA's motion is whether the court must presume that such abuse exists in this case pursuant to section 707(b)(2)(A)(I). The answer to this issue depends upon whether the debtors' current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of section 707(b)(2)(A), and multiplied by 60, is not less than the lesser of 25% of the nonpriority unsecured claims in the case, or $6,575, whichever is greater, or $10,950.

Although there initially was a dispute regarding the amount of the Debtors' currently monthly income and their taxes, the parties have stipulated that the figure for the Debtors' currently monthly income is $6,227.16 and that the amount that should be deducted for taxes is $1,315.28. The parties

remain at odds regarding the amounts by which the debtors' currently monthly income should be reduced for some of the other categories of deductions permitted under clauses (ii), (iii) and (iv) of section 707(b)(2)(A).

Under the BA's determination, the Debtors would have monthly disposable income of $395.33, while the Debtors' figures would result in a negative figure of $65.36 when the (ii), (iii) and (iv) deductions are subtracted from their current monthly income figure. Because the BA's determination has produced a positive amount of monthly disposable income, two sets of computations are required to arrive at the figures that are to be compared in determining whether the presumption of abuse arises.[1] The first computation involves multiplying 60 times $395.33, which yields a figure of $23,719.80. The question then is whether that figure is less than the lesser of (I) 25% of the nonpriority unsecured claims in the case or $6,575, whichever is greater, or (II) $10,950. The unsecured claims in this case total $40,497, and consist of the unsecured claims listed in Schedule E ($29,237) and the unsecured portion of the claims listed in Schedule D ($11,260). Twenty-five percent of that figure is $10,124.25, which is greater than $6,575 but less than $10,950. Thus, $10,124.25 is the controlling figure in determining whether there is a presumption of abuse. Since the disposable income figure as computed by the BA ($23,237), is not less than $10,124.25, abuse must be presumed if the BA's determination of disposable income is correct, a point that is strenuously contested by the Debtors.

The Debtors contend that the BA has understated or failed to include a number of items that should be included as deductions in computing their disposable monthly income. These items

---

[1] The Debtors' figures obviously would not trigger the presumption of abuse since multiplying a negative figure times 60 cannot yield a positive figure.

include a monthly payment of $224.26 which the Debtors contend is the average monthly payment on a debt secured by a security interest in a Yamaha motorcycle that the Debtors contend should be deductible under section 707(b)(2)(A)(iii). The BA contends that the payment is not deductible because the Debtors did not include the payment on line 42 of their original Form 22A and because the Debtors failed to show that the debt actually is secured by the motorcycle. The Debtors did list the debt in their Schedule D as a secured debt and, while the title to the motorcycle was not produced at the hearing, the evidence, taken as a whole, is sufficient to support a finding that the debt is a secured debt. The Debtors' Schedule D was offered into evidence by the BA and the male Debtor's testimony regarding the purchase and financing of the motorcycle, as well as the subsequent monthly payments that were made on the motorcycle, is undisputed. Having fully disclosed the debt in their Schedule D, it is clear that there was no intent on the part of the Debtors to hide the debt or conceal its status as a secured debt. The court is satisfied that the omission of the motorcycle debt from the Form 22A was an innocent oversight and that under the particular circumstances of this case, the Debtors should not be precluded from including the motorcycle payment as a deduction under clause (iii) of section 707(b)(2)(A).

Two other items that are in dispute are the deductions for the Debtors' premiums for health insurance and life insurance. It is undisputed that the actual premiums being paid by the Debtors are greater than the amounts utilized by the BA. In the case of the health insurance, the actual premium is $9.81 per month higher than the BA's figure, while the life insurance premium is $38.38 per month higher than the BA's figure. The amounts of these figures are not disputed by the BA and the only ground of objection is that they differ from the amounts listed on lines 32 and 39 of the Debtors' original Form 22A. For the same reasons stated above, the court will not preclude the use

of the correct premium amounts in determining the Debtors' monthly disposable income even though such amounts differ to a small degree from the amounts in the Form 22A. This in no way should be interpreted as minimizing the requirement that the schedules and statement of financial affairs must be prepared with care and accuracy. However, given the court's conclusion that the Debtors in this case have proceeded in good faith and in the interest of deciding this matter on the merits, the court will allow the corrected figures for the health and life insurance premiums to be utilized in determining the Debtors' monthly disposable income.

Based upon the foregoing, the $395.33 figure relied upon by the BA will be reduced by the $224.26 motorcycle payment, the $38.38 increase in the life insurance premium and the $9.81 increase in the health insurance premium, which results in a monthly disposable figure of $122.88, which, in turn, results in a product of $7,372.80 when multiplied by 60. Since the product of $7,372.80 is less than $10,124.25, there is no presumption of abuse in this case under section 707(b)(2)(A)(I).

This leaves the BA's contention that section 707(b)(3)(B) is applicable in this case and that this case should be dismissed pursuant to section 707(b)(1) even though there is no presumption of abuse. Section 707(b)(3)(B) provides that in considering whether the granting of relief would be an abuse of the provisions of Chapter 7 in a case in which there is no presumption of abuse, the court "shall" consider whether the "totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." This provision was added in 2005 as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The requirement in section 707(b)(2)(B) that the court consider the "totality of the circumstances" is similar to the rule adopted pre-BAPCPA in <u>Green v. Staples (In re Green)</u>, 934 F.2d 568 (4th Cir. 1991), which required a

consideration of the "totality of the circumstances" in determining whether the granting of relief would be a "substantial" abuse of the provisions of Chapter 7 under former section 707(b). After noting the importance of the debtor's ability to repay creditors as a circumstance to be considered, the court in Green provided the following examples of additional circumstances to be considered: (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment; (2) whether the debtor incurred consumer credit far in excess of his or her ability to pay; (3) whether the debtor's family budget is excessive or unreasonable; (4) whether the schedules and statement of financial affairs reasonably and accurately reflect the debtor's true financial condition; and (5) whether the petition was filed in good faith. Id. at 572. Although the amendment to section 707(b) has replaced "substantial abuse" as the trigger for dismissal with simple "abuse" of Chapter 7, there is no reason why the "totality of the circumstances" to be considered by the court under section 707(b)(3)(B) should not include the circumstances described in Green. Accordingly, the court will begin the analysis in this case with a consideration of the factors or circumstances discussed in Green, starting with ability to pay.

Ability to pay remains a factor to be considered in deciding whether a case should be dismissed pursuant to section 707(b)(3)(B) notwithstanding the inclusion of the means test in section 707(b)(2). See In re Lenton, 358 B.R. 651, 663 (Bankr. E.D. Pa. 2006)("The broad language 'totality of circumstances' and 'financial situation' clearly encompasses a debtor's ability to pay."). Evaluation of a debtor's ability to pay in the 707(b) context involves determining the amount that unsecured creditors would receive in a hypothetical Chapter 13 case involving the debtor. Shaw v. Bankruptcy Administrator (In re Shaw), 310 B.R. 538, 542 (M.D.N.C. 2004). If the amount that unsecured creditors would receive in a hypothetical Chapter 13 case is a significant percentage of

the unsecured debt, or if the aggregate amount they would receive is a substantial amount, the debtor has the ability to pay for purposes of section 707(b). See In re Falke, 284 B.R. 133 (Bankr. D. Ore. 2002); In re Norris, 225 B.R. 329 (Bankr. E.D. Va. 1998).

The starting point in determining the amount that unsecured creditors are entitled to receive from an above-median income debtor is the debtor's current monthly income. From such debtor's current monthly income the new provisions provide for the deduction of certain monthly expense amounts specified in the IRS National and Local Standards, the debtor's actual monthly expenses specified as Other Necessary Expenses by the IRS, payments due on secured debts during the 60 months following the petition date and the payment of any priority claims. The figure arrived at through this calculation is the debtor's monthly disposable income. The Debtors contend that in a hypothetical Chapter 13 case this calculation would yield a negative figure, that this establishes that unsecured creditors would receive nothing in a hypothetical Chapter 13 case and that, therefore, there is no ability to pay unsecured creditors. This argument is undermined by errors made by the Debtors in arriving at a negative figure for their disposable income.

Debtors' first error involves the deductions that they could claim in a hypothetical Chapter 13 case for secured debts. This error involves deducting payments on line 47 of the Form 22C for debt payments on property that they are surrendering. This involves payments on a Ford pickup, a sewing machine and a motorcycle which the Debtors are surrendering, which in the aggregate total in excess of $600. While these deductions may be permissible in applying the means test in a Chapter 7 case, the same result does not follow in a Chapter 13 case. In re Crittendon, No. 06-10322, 2006 WL 2547102, at *3 (Bankr. M.D.N.C. Sept.1, 2006). This means that in a Chapter 13 case, Debtors monthly disposable income would be some $600 greater than claimed by the Debtors

in this case, and significantly increases their ability to pay.

The second calculation that undermines Debtors' position regarding their ability to pay involves the payments due on the male Debtor's 401(k) loans. Section 1322(f) provides that a "plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section 1325." Under this provision, amounts required to repay a 401(k) must be excluded from the disposable income of a Chapter 13 debtor. See In re Lasowski, 384 B.R. 205, 209 (8th Cir. BAP 2008). This involves deducting the 401(k) repayment amount from the amount determined to be the debtor's disposable income after making the calculation required under section 1325(b)(2). Id. This deduction is provided for on line 55 of the Form 22C which calls for the entry of "Qualified retirement deductions." It is undisputed that the Debtors have three outstanding 401(k) loans and that the 401(k) loans are included among the types of loans described in section 362(b)(19).[2] The unpaid balance of the three 401(k) loans is $24,927.97. Under the terms of those loans, monthly payments totaling $999.26 per month are required. Under section 1322(f), the Debtors may continue to make the contractual monthly payments on the 401(k) loans and the amounts thus paid do not constitute disposable income for purposes of determining Debtors' obligation to unsecured creditors under section 1325(b)(1)(B). However, the amount that can be deducted cannot exceed the amounts owed

---

'Under section 362(b)(19) the automatic stay is not applicable to the "withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer ... to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986...."

on the 401(k) loans. Id. at 210 ("Thus the Debtor's deduction is limited to the actual loan repayment amount, not the current monthly payment multiplied by the life of the plan."). In the present case, it is undisputed that at the rate of repayment required under the loan documents, the 401(k) loans will be repaid prior to the end of the sixty month plan that would be required if the Debtors were in Chapter 13. The first of the loans will be paid off in May or June of 2010, the second in May or June of 2011, and the third in May or June of 2012. At the point at which each of the loans is paid off, the amounts that were being paid on the 401(k) loans no longer would be excludable from disposable income and would become available for payments to unsecured creditors. The resulting increases in disposable income are substantial and over a 60 month plan period would enable the Debtors to pay a substantial percentage of the debt owed to unsecured creditors. This ability to pay weighs heavily against the Debtors in determining whether the granting of relief in this case would be an abuse of the provisions of Chapter 7. See In re Lipford, 397 B.R. 320, 330 (Bankr. M.D.N.C. 2008); In re Lenton, 358 B.R. at 664.

There has been no showing in this case that the Debtors' filing was the result of sudden illness, calamity, disability or unemployment, which also weighs against the Debtors. The male Debtor has been employed as a truck driver with his present employer for the last seventeen years. His income has been steady and was in excess of $60,000 during 2006, 2007 and 2008, and has continued at about the same level during 2009. The employment picture for the female Debtor is somewhat different. Her employment for the most part has been in the textile industry where she worked as a sewing machine operator. With the decline of the textile industry that has occurred in North Carolina, it became increasingly difficult for the female Debtor to find full-time employment in the textile industry. Her work history for the last three or four years has involved layoffs, periods

of unemployment and having to accept other work such as part-time retail work and home healthcare. Nevertheless, during 2006, 2007 and 2008, the combined income of the Debtors was in excess of $70,000 each year. Moreover, although the female Debtor's employment and income have deteriorated, the deterioration has involved a steady, gradual decline that has occurred over a period of four or five years and does not account for the bankruptcy filing, given the substantial earnings of the male Debtor during that period and the fact that the Debtors had the time and opportunity to adjust to the female Debtor's changing employment prospects.

The second factor to be considered is whether the Debtors incurred consumer debt in excess of their ability to pay. When the Debtors filed their petition, they had both secured and unsecured consumer debt. The unsecured indebtedness listed in Schedule F totaled $29,237 and consisted of $1,410 in retail purchases, an automobile repossession deficiency of $4,387, a non-purchase money consumer loan of $15,025 and $8,415 in credit card indebtedness. The secured indebtedness involves two mortgages on their home, the balances owed on a motorcycle purchased in 2005 and a 2008 Toyota automobile purchased in December of 2007, a loan secured by a 1993 Ford Ranger and the purchase price of household furniture, representing total secured indebtedness of $164,430, which exceeded the value of the property securing such indebtedness by $34,930. The excessive expenditures in these purchases include a relatively new vehicle for their daughter that ultimately was surrendered to the finance company; the purchase and immediate trade-in of a new Toyota automobile for a larger, more expensive model in late 2007 or early 2008; and purchases of a motorcycle that carried a very high interest rate, an expensive sewing machine and additional household furniture before an earlier purchase had been paid off. These purchases led to an increasing mound of indebtedness that clearly went beyond the financial ability of the Debtors. In

addition to the foregoing indebtedness, the Debtors also obtained 401(k) loans from the male Debtor's 401(k) plan in 2005, 2006 and 2007, and owed a total of $24,927.97 on those loans, as well. Most of this indebtedness was incurred after it became clear that the female Debtor's earnings were in decline and that her employment prospects were diminishing. Based upon the foregoing, the court concludes that the Debtors incurred consumer debt far in excess of their ability to pay, which likewise weighs against the Debtors.

The third circumstance to be considered is whether the Debtors' family budget is excessive or unreasonable. If the family budget is viewed as encompassing the amounts expended on living and household expenses, the Debtors' current family budget is not unreasonable. The Debtors reside in a modest residence they are purchasing. There are two mortgages on the property which require a total of $863 per month to service the indebtedness secured by the two mortgages. Their current budget includes one car payment of $566 per month on a 2008 Toyota Camry. The amounts in their budget for food, transportation, and other living expenses are not excessive. While there are some items such as cell phone service and internet access that could be eliminated, the amounts included in the Debtors' budget for household and living expenses do not exhibit extravagance. The BA argues that the budget is excessive because of the deductions from the male Debtor's income for contributions to the 401(k) plan provided by his employer and for payments on the 401(k) loans obtained by the male Debtor. The amounts being deducted for the contributions and the loan payments, while substantial, were not increased or otherwise manipulated prior to the bankruptcy filing in order to gain an additional advantage in the bankruptcy case. This circumstance weighs in favor of the Debtors.

The next circumstance to be considered is whether the schedules and statement of financial

affairs reasonably and accurately reflect the Debtors' true financial condition. In arguing that this circumstance weighs against the Debtors, the BA points to several errors in the Form 22A. These errors involve a failure to list the motorcycle payment as a secured debt on line 42, an inaccuracy in the total indebtedness figure on line 47 and an omission from the Form 22A of the income of the female Debtor during the six months preceding the filing of the petition. As noted earlier, the motorcycle payment was disclosed as a secured debt on Schedule D. The error on line 47 resulted in an overstatement of expenses by a total of $88.25 and appears to have involved an error on the part of counsel. The female Debtor was unemployed when the case was commenced, and the failure to list her historical income appears to have resulted from a misunderstanding on the part of the Debtors regarding the concept of current monthly income. Given the overall accuracy of the other schedules and the statement of financial affairs, the court is satisfied that the schedules and statement of financial affairs reflect the financial condition of the Debtors on the petition date with reasonable accuracy, which weighs in favor of the Debtors.

The last factor that will be considered is whether the petition was filed in good faith. Whether a Chapter 7 case was filed in good faith is an important factor in applying section 707(b). See In re Kestell, 99 F.3d 146 (4th Cir. 1996). The requirement of good faith is intended to prevent abuse of the bankruptcy process by debtors who invoke bankruptcy to achieve any improper purpose or to take unfair advantage of their creditors. Id. at 147. There are certain aspects of this case that appear inconsistent with good faith. On August 23, 2008, only 60 days before filing for bankruptcy, the Debtors used their Capital One credit card to purchase a flat screen television and sound system at a cost of $1,400. When this case was commenced, the Debtors still owed $1,364 on this purchase. One month earlier, in July of 2008, the Debtors obtained a $1,200 cash advance using their

Washington Mutual credit card, which likewise remained unpaid when this case was commenced. In fact, between February of 2008 and September of 2008, the Debtors made charges on their Washington Mutual credit card that totaled in excess of $4,300 that remained unpaid when Debtors filed their petition. These Capital One and Washington Mutual charges, coming when they did, suggest an intention on the part of the Debtors to take unfair advantage of their creditors. However, even if the good faith issue is resolved in favor of the Debtors, the ability to pay and other circumstances that are discussed as weighing against the Debtors are such that the granting of a Chapter 7 discharge would involve an abuse of the provisions of Chapter 7. However, the court will not dismiss this case without giving the Debtors the opportunity to convert this case to one under Chapter 13 if they wish to do so. Accordingly, the Debtors are allowed to and including June 30, 2009, within which to convert this case to a case under Chapter 13. If conversion does not occur by June 30, an order shall be entered in accordance with this memorandum opinion dismissing this case pursuant to section 707(b)(1).

This 19th day of June, 2009.

*William L. Stocks*
WILLIAM L. STOCKS
United States Bankruptcy Judge

PARTIES IN INTEREST

William Steven Martin
Gail Lynne Martin
249 Odle Lane
Eden, NC 27288

Phillip E. Bolton, Esq.
P.O. Box 10247
Greensboro, NC 27404-0247

Michael D. West, Bankruptcy Administrator